Bevis, J.
 

 The claimants in these cases can prevail on one ground only, that they are owners of the funds they claim, either in law or in equity. They cannot prevail as preferred
 
 creditors.
 
 They fall within none of the classes of creditors which the law prefers in the distribution of an insolvent’s assets, and must therefore fail if they occupy the position of creditors at all.
 

 Were they owners? Did they continue to own the funds deposited by them in the trust department of the bank, or had title passed from them in exchange for the bank’s obligation to pay to them or to their designees equivalent sums?
 

 Both, of course, assert that title, at least title in equity, never passed.
 

 
 *98
 
 In the
 
 Escanaba Paper Co. case
 
 it is urged that the deposits in question were put by the bank into what was designated a “Trust Account”; that each month’s deposit consisted of a single check and that check for a uniform amount, to be applied by the bank to a single specific purpose, payment of interest and principal on the bonds,- that this account was never used as a checking account nor for any purpose other than accumulating and forwarding the bond requirements to the Old Colony Trust Company of Boston. In addition, this claimant urges the provisions of the contract under which the deposits were made,
 
 i. e.,
 
 “such payments on account of the interest and principal
 
 to be held by you,
 
 and forwarded to the old Colony Trust Co., Boston, Mass., not later than the fifteenth day of May and November in each year.
 

 “You agree to accept the deposits made by this company as a special deposit and expressly covenant and agree not to apply the same against any claims, indebtedness, or other obligations whatsoever of this company.” (Italics ours.)
 

 To negative the inference of retention of title which the foregoing provision might be said to raise, the plaintiff in error urges the clause in the contract which provides:
 

 “You [the bank] further agree to allow us interest on these deposits, at a rate of not less than 4% per annum.”
 

 While the circumstances pointed out by the paper company might well be harmonized with the creation of a trust and the retention of the equitable title to the deposits, in our opinion they fall short of proving that such trust was actually created. The agreement that the money was “to be held” and forwarded to Boston on certain days might just as well have been carried out by the bank’s taking title to the deposits and forwarding an equivalent each time to the Boston institution. The agreement not to apply the deposits
 
 *99
 
 against any claims, indebtedness or other obligations of this company is, at most, an agreement to relinquish the rights of set-off, for the protection of the bondholders. That this was the purpose intended is especially indicated by the fact that the bank agreed to refrain from applying said funds against “claims of” the paper company as well as against its indebtedness and obligations. And the agreement to “accept the deposits * * * as a special deposit”, together with the fact that such deposits were entered on the books in a “Trust Account”, lose most of their apparent significance when considered in connection with the clause: “You further agree to allow us interest on
 
 these deposits,
 
 at a rate of not less than 4% per annum.” (Italics ours.)
 

 In 5 Ohio Jurisprudence, 379, Section 86, it is said: “A special deposit is created where the money is left for safekeeping, and the identical thing is to be returned to the depositor.”
 

 In American Law Institute Restatement of the Law of Trusts, Tentative Draft No. 1, page 44, Section 15,
 
 Comment h,
 
 it is said: “If money is deposited in a bank for a special purpose, the bank is a trustee or bailee of the money if, but only if, it is the understanding of the parties that the money deposited is not to be used by the bank for its own purposes.”
 

 In 6 Corpus Juris, 1086, Section 3, it is said: “If by the contract there is no obligation to restore the specific article, but the bailee is at liberty to return either money or other goods of equal value, there is a transmutation of property, and the obligation created is a debt and not a bailment.”
 

 Without citing the authorities which might be marshalled to support these statements, we raise at once the inquiry whether the bank was bound to keep the funds in question segregated from its other assets, or whether it might use them as its own, subject only to
 
 *100
 
 the obligation, to respond with an equivalent upon a proper call.
 

 Referring again to the American Law Institute Restatement of the Law of Trusts, Tentative Draft No. 1, page 41, Section 15,
 
 Comment g:
 

 “If there is an understanding between the parties that the person to whom money is paid shall pay ‘interest’ thereon (at a fixed or at the current rate, and not merely such interest as the money, being invested, may earn) the relationship is practically always a debt and not a trust. Interest is paid for the use of the money, and if the payee pays interest he is, in the absence of a definite understanding to the contrary, entitled to use the money for his own purposes. It is theoretically possible of course for a trustee to pay ‘interest’ from his own funds, but in the absence of a clear agreement to that effect such an intention would not be found.”
 

 This we believe to be a fair statement of the law.
 

 In
 
 McDonald, Admr.,
 
 v.
 
 Fulton, Supt. of Banks,
 
 125 Ohio St., 507, 511, 182 N. E., 504, 83 A. L. R., 1107, 1110, it is said: “It is to be observed that deposit in an interest bearing account is directed, which
 
 of course
 
 contemplates use of the fund by the bank. ’ ’
 

 See also:
 
 Doty
 
 v.
 
 Ghinger,
 
 166 Md., 426, 171 A., 40 (1934);
 
 Missouri Mutual Assn.
 
 v.
 
 Holland Banking Co.,
 
 220 Mo. App., 1256, 290 S. W., 100 (1927);
 
 Old Colony Trust Co., Recr.,
 
 v.
 
 Puritan Motors Corp.,
 
 244 Mass., 259, 138 N. E., 321 (1923);
 
 Sam
 
 v.
 
 Ludtke
 
 (Tex. Civ. App.), 203 S. W., 98 (1918);
 
 Blair
 
 v.
 
 Follansbee, Admr.,
 
 67 Ill. App., 144 (1896);
 
 Price
 
 v.
 
 Dawson,
 
 111 Mich., 279, 69 N. W., 650 (1896);
 
 Budd
 
 v.
 
 Walker, Exr., 113
 
 N. Y., 637, 21 N. E., 72 (1889);
 
 Pittsburgh National Bank of Commerce
 
 v.
 
 McMurray,
 
 98 Pa., 538 (1881).
 

 Claimant suggests in argument that the bank was willing to pay interest for the privilege of handling this fund on a non-profit basis because it enjoyed other
 
 *101
 
 profitable relationships with the paper company. That company did indeed carry a commercial account with the bank. But it had that account before this “Trust Account” was opened, and we find no convincing proof that retention of the commercial account depended upon the allowance of this interest.
 

 Quoting again the foregoing sentence from the Restatement of the Law of Trusts: ' 'It is theoretically possible of course for a trustee to pay 'interest’ from his own funds, but in the absence of a clear agreement to that effect such an intention would not be found.”
 

 Finding, as we do, that no trust was created, but that the title to funds deposited by the Escanaba Paper Company passed to the bank, it is unnecessary in the
 
 Escanaba Paper Go. case
 
 to advert to the further contentions of the plaintiff in error that such funds could not be traced into cash in the vaults, and that the case is ruled by the provisions of Section 710-165 of the General Code.
 

 These further contentions become of greater moment, however, when we turn to consider the claim of the University of Dayton.
 

 That the parties intended to create a trust in that case is clear beyond question. Their rights and duties were set forth in an elaborate “Mortgage Deed of Trust” which conveyed to the bank the legal title of the property given to secure the bonds, provided in detail for the periodical payment of the money required for interest and bond maturities, and further provided that for its services in' the handling of this money the bank should be paid a percentage fee to come out of such funds themselves.
 

 If, as we have said, these claimants must, to succeed, establish ownership of the funds in question, it follows, as a corollary, that, before their claims for preference can be allowed, they must be able to trace the funds to which title is asserted into the assets of the bank at the time of closing.
 

 
 *102
 
 The plaintiff in error insists, however, that unless the check drawn upon the commercial department of the hank and deposited in its trust department can be traced into the
 
 cash
 
 found in the bank’s vaults at the time of its suspension, the claim for preference must fail. It is pointed out that the university at the beginning of the transaction had a checking account, was a creditor of the bank for a given sum; that it drew its check upon that account, which check it deposited with the trust department; that the bank’s books thereupon showed the acknowledgment of a lesser obligation to the university upon the checking account and a correspondingly greater one by the trust department; that the subsequent transfer of this credit by the trust department back to the commercial department only continued the same process, and that in the end there had been neither an augmentation of the cash in the hands of the bank, nor an exchange of the value, represented by the check, for title to any actual money. On the contrary, it is insisted that the net result of this entire series of acts was to leave the bank under a duty
 
 in personam
 
 to pay the number of dollars called for by the check (less the amount of its commission).
 

 One cannot, it is pointed out, be a trustee of his own duty.
 

 This line of argument at first blush seems logically impeccable. Yet, in its implications it clearly “proves too much.” Followed out as relentlessly as the plaintiff in error would have us follow it here, it would lead to a situation where a bank, acting as trustee, would have to perform its duties with physically segregated quantities of cash, to which ownership in equity could definitely attach. Such a course, while actually possible, is practically never pursued because of its inconvenience. Instead, cheeks and other instruments are frequently treated “as if” they were cash, or tangible property, and the law, we believe, permits some latitude in this respect. The university in this
 
 *103
 
 case could have cashed its check at the commercial department for dollars and could have put those dollars into the trust account. But was it bound to do so?
 

 “Under modern banking conditions, the rule as stated should be held to apply to cash items received by a bank under a trust agreement as well as to cash so received. Such an item for all practical purposes differs not at all from currency. It increases the cash funds of the bank just as much as does a deposit of currency. If the bank cashes it and covers the proceeds into its vaults, the augmentation, of course, is apparent. If, however, the bank treats the cash item as its own and uses it for other banking purposes, such as payment of debts or creating credits in other banks, the cash in the vaults of the bank is relieved to that extent; and, where a trust with respect to a cash item is involved, it must be presumed that the intention was that cash remaining in the vaults of the bank is to be substituted under the trust. There is no more reason, in such case, for refusing to declare a trust on the funds remaining than there would be to refuse to do so because the bank had paid out the identical currency which the
 
 cestui que
 
 trust had placed in its possession. In other words, we think that a cash item, which is accepted by a bank as cash and fulfills for it the functions of cash, must be treated as cash in determining whether the cash remaining in the bank is subject to a trust because of the commingling of trust funds.”
 
 Schumacher
 
 v.
 
 Harriett,
 
 52 F. (2d), 817, 819, 82 A. L. R., 1, 6.
 

 “Applying these rules, there can be no doubt but there was an express demand on one side, and consent on the other, that this check should be placed to the credit of the plaintiffs as a deposit. The legal effect of the transaction was precisely the same as though the money had been first paid to the plaintiffs and then deposited.”
 
 American Exchange National Bank
 
 
 *104
 
 v.
 
 Gregg,
 
 138 Ill., 596, 600, 28 N. E., 839, 32 Am. St. Rep., 171, 174.
 

 “Where, therefore, the holder of a check, or other genuine instrument representing a fixed sum, delivers it to a bank and receives an unqualified credit as for a definite sum of money, the transaction is equivalent to an actual deposit of so much cash as of the date of the credit.”
 
 Wasson, Treasurer,
 
 v.
 
 Lamb,
 
 Assignee, 120 Ind., 514, 517, 22 N. E., 729, 16 Am. St. Rep., 342, 345, 6 L. R. A., 191, 192.
 

 If the reasoning of these courts is correct it would seem to follow that a trust may be established without tracing the check deposited into actual
 
 cash
 
 in the vaults. If the value represented by the check can be followed through the bank’s books into assets belonging to the bank when it is closed, the requirements of the modern law are satisfied.
 

 In 5 Ohio Jurisprudence, 509, Section 182, it is said:
 

 “Under earlier holdings the mingling of trust funds, with money of the trustee, was held to defeat the owner’s title and compel him to stand as a mere unsecured creditor, upon the theory that money was not earmarked, and therefore could not be recovered in specie. But this view seems no longer to obtain in Ohio. It is not, the courts say, the identical dollars that may be pursued, any more than it is the identical grains of wheat put in a warehouse or elevator that the depositor may follow, but the equivalent in dollars ; the rule now is that, where a bank mingles trust money with its own funds, money paid out from such funds for its own purposes will be presumed to have been paid from its own money and not from the trust fund, in a situation where the mingled fund has not been reduced at any time below the amount of the trust fund; this presumption rests upon the idea that the amounts drawn out from time to time were of moneys which the bank had a right to expend in its own business, and that the balance which remained in-
 
 *105
 
 eluded the trust fund, which the bank had no right to use, and the use of which would have been a violation of its trust, which will not be presumed in the absence of evidence to that effect.”
 
 Smith et al., Trustees,
 
 v.
 
 Fuller et al., Assignees,
 
 86 Ohio St., 57, 99 N. E., 214, L. R. A. 1916C, 6, Ann. Cas., 1913D, 387;
 
 Orme and Okey, Receivers,
 
 v.
 
 Baker,
 
 74 Ohio St., 337, 78 N. E., 439, 113 Am. St. Rep., 968.
 

 In the instant case the proceeds of the check deposited by the university can be traced through the books of the bank into an account in the commercial department called “Uninvested Trust Funds.” At the time the bank closed there was cash in its vaults more than sufficient to cover the entire uninvested trust funds account, and more than the aggregate of all preferred claims. There is no claim that the cash at any time was less than the aggregate of the uninvested trust funds. In our opinion, therefore, the difficulties of tracing in this case would not be insuperable.
 

 During the entire period of this transaction, however, Section 710-165 of the General Code of Ohio read as follows:
 

 “No property or securities received or held by any trust company in trust shall be mingled with the investments of the capital stock or other properties belonging to such trust company or be liable for its debts or obligations. Moneys pending distribution or investment may be treated as a deposit in the trust department, or may be deposited in any other department of the bank, subject in other respects to the provisions of law relating to deposit of trust funds by trustees and others.”
 

 As we have already seen, the proceeds of the check in question were deposited by the trust department to its credit in the commercial department of the bank and so remained until the bank was taken over for liquidation.
 

 
 *106
 
 In
 
 McDonald, Admr.,
 
 v.
 
 Fulton, Supt. of Banks, supra,
 
 decided by this court on June 8, 1932, the Cummings Trust Company having in its possession as administrator the funds of an estate, deposited said funds in its commercial department; the trust company failed, and McDonald, who was appointed administrator
 
 de boms non
 
 in place of the insolvent institution, claimed a preference over general depositors in the distribution of the assets. The essential facts are, therefore, on all fours with those in the instant case. Section 710-165 of the General Code, as set forth above, was then in force, and this court, considering its effect upon the facts in the
 
 McDonald case,
 
 held:
 

 “1. The provisions of Section 710-165, General Code, authorize a bank organized under the laws of this state, with powers of a trust company,' to make a general deposit of money received by it as trustee and held temporarily pending investment or distribution, in the commercial or other department of such bank, unless otherwise expressly provided by the trust agreement creating and controlling such trust.
 

 “2. As to such funds the relation of the bank and trustee is as debtor and creditor, and funds thus deposited may be used by the bank in its general business as other assets.
 

 “3. The rights of the trustee, with reference to the funds so deposited, are no greater than or different from those of other general depositors, and upon liquidation of the bank they all share proportionately in the distribution of the assets.”
 

 Section 710-165, General Code, as it stood in 1931, must be read into the contract under which the deposit of the University of Dayton was made. The effect of the statute, as it then read, has been determined by this court in the
 
 McDonald case.
 
 That the statute has since been amended can be of no concern to us here.
 

 As construed in the
 
 McDonald case,
 
 that statute authorized the bank to put these funds into the commer
 
 *107
 
 cia! department unless in the trust agreement there was an express provision to the contrary. We have been able to find no such express provision. Such funds, when so deposited in the commercial department “may be used by the bank in its general business as other assets.” In such case there can be no preference in distribution.
 

 We are unable to perceive the force of the suggestion in the brief of the defendants in error that, Section 710-165, General Code, as thus construed, contravenes the provisions of Section 26, Article II of the Constitution of Ohio: “All laws, of a general nature, shall have a uniform operation throughout the state.” The statute applies in terms to all trust companies. As stated in
 
 Dillon
 
 v.
 
 City of Cleveland,
 
 117 Ohio St., 258, 272, 158 N. E., 606: “It is settled beyond argument that Section 26 of Article II permits reasonable classifications, and the section is not violated if laws have a uniform operation upon all subjects within a class thus reasonably established.”
 

 Had the amendment of Section 710-165, Genera] Code, become effective in time to have applied to the transaction in the case of the University of Dayton the result might have been otherwise. We must, however, take the law as the Legislature gave it. Under the law as it stood in 1931 there could be no preference.
 

 For the foregoing reasons the judgment of the Court of Appeals in each of the cases here considered must be reversed.
 

 Judgments reversed.
 

 Stephenson, Matthias and Wilkin, JJ., concur.
 

 Zimmerman, J., concurs in the judgment in cause No. 24692, but dissents from the judgment in cause No. 24734.
 

 Weygandt, C. J., and Jones, J., dissent.