"Williams, J.
 

 Under Ohio law there are certain generic differences that should be observed in analyzing the legal theories pertaining to claims for preference. In the instant cases there are three distinct classes, which are directly or indirectly involved in determining the legal rights of the parties; first, claims for preference based on alleged special deposits; second, those founded on alleged agency of the bank; and, third, those growing out of the trusteeship of a banking institution with a trust charter, in holding trust funds for distribution. This classifica
 
 *248
 
 tion is not necessarily exhaustive but is essential to clarity of thinking in the present inquiry.
 

 The two cases at bar were argued and submitted together and each involves the question of preference with regard to the proceeds derived from the sale of travelers cheques. There is no question but that the defunct banking institutions were chartered to do both a banking and trust business.
 

 The courts below seem to have treated both cases as though they stood on the same basis, at least to the extent of taking the position that differences that did exist were not sufficient to require the application of different legal principles or to lead to different conclusions. To this court the factual settings are such as to require separate consideration.
 

 The case relating to the Commercial Savings Bank
 
 &
 
 Trust Company will be considered first.
 

 The questions presented therein are twofold: Is the express company'entitled to a preference (1) with reference to receipts from sales from August 1, 1931, to August 13, 1931, inclusive, and (2) with reference to such receipts on August 14 and 15, 1931.
 

 The contract between the express company and the commercial bank was entered into by correspondence. By its terms the travelers cheques were to be sold and the proceeds credited on the books of the bank to the account of the express company, and a memorandum was to be sent to the latter by the bank showing each day’s business so that the express company would have a record of the sales included in the total deposited. Remittance was to be made on the last day of each month by Chicago or New York draft.
 

 The agreement was carried out substantially as made up to and including August 13, 1931, and the amounts collected were entered on the books of the bank in the account headed “Travelers’ Check Liability Account,” the bank debiting itself and giving credit as agreed upon.
 

 
 *249
 
 At the time the commercial bank went into liquidation, there was on deposit in the account the sum of $14,796.62, plus commissions, all derived from sales from August 1,1931, to August 15,1931, inclusive. No attempt was ever made to remit this amount nor any part of it. Of this amount $4631.50 (plus commissions) was received from sales of cheques on August 14 and 15, 1931. The receipts of these two days require separate consideration due to the fact that there was correspondence between the parties which changed the original agreement from and after August 13, 1931.
 

 Consideration will first be given to receipts from sales from August 1, 1931, to August 13, 1931, inclusive, the total amount of which was $10,165.12.
 

 In selling the cheques and receiving the purchase price therefor the commercial bank was the agent but on depositing the money under the agreement the relation of principal and agent was changed into that of depositor and depositee. The express company, however, claims that the deposit was special and its claim should be preferred.
 

 There is no question but that under this contract, standing alone, the money placed in the account would be held as a general deposit.
 

 In the Restatement of the Law of Trusts, Yol. 1, page 46, Section 12, the rule is stated as follows: “If money is deposited in a bank for a special purpose, the bank is a trustee or bailee of the money if, but only if, it is the understanding of the parties that the money deposited is not to be used by the bank for its own purposes.” This language has been approved by this court in
 
 Fulton, Supt. of Banks,
 
 v.
 
 Escanaba Paper Co.,
 
 129 Ohio St., 90, 193 N. E., 758, and
 
 Squire, Supt. of Banks,
 
 v.
 
 Oxenreiter,
 
 130 Ohio St., 475, 200 N. E., 503.
 

 There is, however, another vital consideration. After such arrangement for the sale of cheques had been made, the express company delivered to the bank vari.
 
 *250
 
 ous amounts of cheques from time to time and upon receiving each allotment the bank signed a so-called trust receipt which contained a provision that the proceeds should at all times remain the property of the express company. Photostatic copies of the receipts are a part of the record and they are shown to be uniform printed forms.
 

 The next inquiry is whether this course of conduct gave rise to an understanding of the parties which forbade the use of the proceeds in the business of the bank. The express company had no knowledge of the method by which the bank kept account of the proceeds other than that disclosed by the correspondence, but, in fact, there was no segregation and the money was used in the banking business. Two views may be taken depending on the approach to the question. One is that the alleged trust receipt and correspondence, though wholly separate, must be construed together., and the deposits deemed demarcated by the stipulation in the trust receipt. Under this construction it is claimed the bank would be required by the understanding of the parties to treat the money
 
 deposited
 
 as belonging to the express company and not commingle it with the funds of the bank. If this is the correct interpretation of the contractual relation of the parties the deposit is special. The other view is that the stipulation in the trust receipt gave character to the proceeds only so long as the bank held the money as agent but that in authorizing the deposit of the money without limitation or restriction as to use in the contract or agreement of deposit, the express company consented that agency should end with the deposit. Color is lent to this latter viewpoint by the fact that the correspondence created the agency and at the same time provided for its termination by the process of depositation. It' could not be claimed that even under the terms of the receipt the money continued to be the property of the express ^company after the bank by
 
 *251
 
 consent of the former ceased to hold it as agent. The better view seems to be that a uniform printed receipt should not prevail to change the original agreement under the circumstances. It is hardly in keeping with dictates of reason to hold that an agreement for a general deposit of funds can be altered by a printed receipt which refers to funds as being held in agency but contains no language referable to the nature of the deposit, otherwise agreed to, nor to the segregation of the money deposited. In the correspondence the express company predicted a large increase in their “business, which should prove mutually profitable” with* assurances of an annual total of at least $100,000 yet made no suggestion that the proceeds should not be commingled with the bank funds. This fact, of itself, affords a strong implication that the extent of the bank’s general business would be broadened by an increase of deposits. The conclusion must be that the deposit was general and not special.
 

 The express company, in its letter dated August 13, 1931, two days before the bank closed, referred to the deposits as trust funds. Whatever effect this reference had on subsequent receipts from sales, it could not serve to change the relationship under which moneys on deposit were held. As to them the relationship of debtor and creditor continued to subsist.
 

 The express company relies upon
 
 American Express Co.
 
 v.
 
 Hansen,
 
 176 Wash., 187, 28 P. (2nd), 788.- An examination of that case shows that there was no agreement that the bank should give credit on its books for the proceeds of sale, and such agreement as there was appears to have been incorporated in the trust receipt which differs in form from that involved here in that it provided that the bank should hold in trust the proceeds of sale.
 

 In
 
 Smith, Liquidator,
 
 v.
 
 American Express Co.,
 
 113 Fla., 396, 152 So., 171, the facts are similar to those involved under the original agreement in the commercial
 
 *252
 
 bank case. The trust receipt was- worded similarly and the correspondence provided for deposits. It is true that the express company in a letter to the bank spoke of “the use of the money” by the bank; otherwise the two cases seem To be similar as to the facts. It was held that there was no preference.
 

 In legal effect the factual variation between that case and the phase of the commercial bank case under discussion constitutes a distinction without a difference. The original agreement shown by the correspondence in the latter contemplated use of the money by the bank; to have expressly agreed to such could not have increased the obligations of the contract.
 

 There is another phase to this inquiry and that is as to the effect of a demand that the receipts on deposit be immediately forwarded to the express company and the failure to comply on the part of the commercial bank. That such noncompliance does not give rise to a preference where the deposit is general has been settled by this court.
 
 Squire, Supt. of Banks,
 
 v.
 
 Tobin, Exr.,
 
 130 Ohio St., 439, 441.
 

 As a matter of law the express company is not entitled to a preference as against the commercial bank as to funds received by the bank under the original contract.
 

 The case involving the Ohio bank and the receipts from sale of checks by the commercial bank on August-14 and 15,1931, rest on a different footing. In
 
 Smith
 
 v.
 
 American Express Co., supra,
 
 the Supreme Court of Florida referred to one of its earlier reported cases,
 
 American Express Co.
 
 v.
 
 Cochrane, Liquidator,
 
 103 Fla., 426,137 So., 696. In the latter case the facts were similar in nature to the former case in that the contract was made by correspondence followed by the signing of trust receipts providing that proceeds should at all times remain the property of the express company; but dissimilar in that the correspondence did not refer to a deposit of the money nor to the
 
 *253
 
 opening of an account. A preference was allowed. A careful analysis will disclose a similar distinction between tbe money received by tbe commercial bank under tbe original agreement on the one hand and the money received by each bank under the new agreements arising out of correspondence beginning with the two letters of the express company (one to each bank), dated August 13, 1931, on the other.
 

 It is true that in the Ohio bank case an arrangement for deposits of funds was made between the bank and the express company but as to these funds a check for $8,140.10, which covered all sales of cheques previous to August 14, 1931, was paid through clearing house before the Ohio bank went into liquidation.
 

 A cashier’s check for the amount of sales made on August 14, 1931, was sent to the express company, but was not paid because the bank in the meantime had gone into liquidation. The amount of this check has since been paid by the Superintendent of Banks and is not now in controversy.
 

 At the time of closure the only proceeds of travelers cheques in the hands of the Ohio bank were such as it had agreed to make remittance of daily, or in other words only the amounts received for sales on August 15, 1931, amounting in all to $1854.63 plus the bank’s commissions on such sales and an additional amount of $102.50 for travelers cheques delivered in Paris, Prance. No remittance of the amounts collected on this date was attempted, with the exception that the bank forwarded to the express company two cashier’s checks, one for $60.15 (covering one cash sale included in the amount of $1854.63) and one for $102.50, both of which were returned unpaid due to the liquidation of the bank.
 

 In the correspondence between the express company and the commercial bank forming the new agreement (letters dated August 13, 14 and 15, 1931) the express company referred to the proceeds of sales of travelers
 
 *254
 
 cheques being held as trust funds, expressed desire to terminate the existing relation, requested a remittance by draft covering all accumulated sales up to and including August 14 and advised that it would let the bank know its desires as to remitting* for future sales of cheques. The commercial bank replied by assenting to the proposal.
 

 There was similar correspondence between the express company and the Ohio bank (see letters of same dates) in which a new agreement was entered into of substantially the same import except that it was agreed that remittances should be made daily.
 

 Under the new agreement in the commercial bank case the money was held by the bank as agent for remittance according to future direction; under the new agreement in the Ohio bank case the money was held by the bank as agent for daily remittance. In each case the new agreement took away the authority to deposit.
 

 The total amount collected by the commercial bank from sale of cheques on August 14 and 15, 1931, was $4361.50 (plus commissions) which was deposited in the same account with the amount taken in on such sales during the month of August previous, making a total of $14,796.62 (after deducting commissions). The record does not disclose how such sum of $4361.50 was paid to the bank but it does appear that it was received either in cash, by checks on the bank itself, or by checks on other banks. In our opinion the receipts for these two days stand upon exactly the same basis as to preference and tracing the funds as does the Ohio bank case.
 

 With this understanding we will proceed with a discussion of the Ohio bank case as, due to the availability of specific facts, the question can be treated in a more effective way.
 

 It is thus apparent that, whereas we have had under discussion the question whether funds deposited under
 
 *255
 
 agreement therefor constituted a special deposit, we shall now consider the effect of the new agreement which did not authorize a deposit.
 

 What are the facts as to the moneys held hy the Ohio bank when it went into liquidation?
 

 As to the amount of $1854.63 (other than the amount of $60.15 referred to) it still remained in the bank’s hands as agent and no remittance thereof was ever made or attempted. This amount was therefore held in a fiduciary capacity by the bank for the express company at the time the former went into liquidation. There can be no question but that the express company is entitled to preference for this unremitted amount in so far as the fund can be traced.
 

 As to the amounts of $60.15 and $102.50, for which cashier’s checks were forwarded, an interesting question is presented.
 

 There are numerous authorities upon the subject of preferences growing out of moneys received by banks in making collections. While the present inquiry involves proceeds of sales by the bank as agent the question here is so closely akin to the one considered in the collection cases that the decisions in those cases are pertinent in the solution of the problem at hand.
 

 There is much confusion among the authorities as to the relationship existing between the bank and the claimant where a bank acts as agent in making a collection and then forwards the proceeds by cashier’s check or bank exchange. Upon this question there are two schools of juristic thinking. One fathers the doctrine that the agency is terminated by the mere fact of remittance; the other school asserts that in making the remittance the bank continues to act as agent.
 

 Upon this question many authorities are collected in 73 A. L. R., 71; 90 A. L. R., 6; and 95 A. L. R., 682.
 

 There is some question as to which doctrine is supported by the weight of authority.
 

 This court however is not compelled to determine
 
 *256
 
 this question or apply either doctrine to the solution of the problem at hand for reasons which presently will be made to appear.
 

 Even in those jurisdictions which adhere to the doctrine that the use of bank exchange to forward the proceeds collected by the bank, as agent, changes the relation to debtor and creditor, it is held that there is an exception to the rule which may be stated thus: Where there are tokens of an intention that the fiduciary relation shall continue even after remittance, then the bank holds the funds in trust until remittance is complete; in that event if the bank goes into liquidation before remittance is complete a preference arises.
 
 Jennings, Recr.,
 
 v.
 
 United States Fidelity & Guaranty Co.,
 
 294 U. S., 216, 55 S. Ct., 394, 79 L. Ed., 869.
 

 We shall therefore inquire what are the circumstances and whether there are tokens of such an intention.
 

 The new agreement entered into by which the deposit of the proceeds was terminated and daily remittance substituted is an important factor to be considered. The making of such agreement coupled with the stipulation in the receipt that the proceeds should at all times remain the property of the express company are, taken together, manifestations of an intention that the relation of debtor and creditor should not arise through remittance.
 

 It may be said, however, that the bank was chartered as a trust company and that if the funds were held in trust the trust company was empowered under Section 710-165, General Code, to make a general deposit thereof in the commercial or other department pending distribution under the rule laid down in
 
 McDonald, Admr.,
 
 v.
 
 Fulton, Supt. of Banks,
 
 125 Ohio St., 507, 182 N. E., 504, 83 A. L. R., 1107.
 

 This rule applies only to funds arising from a trust, which can be administered only by a bank which has
 
 *257
 
 a trust charter. The funds held by the bank as agent in the instant cases were received under an agreement which a bank, not having a trust charter, could make, because any bank may act as agent in selling travelers cheques whether it has a trust charter or not. To such funds Section 710-165,- General Code, has no application.
 

 For the reasons given the bank held all the proceeds as agent including the part of which remittance had been attempted by cashier’s checks.
 

 There still remains the application of the doctrine of tracing the trust fund. Even though the bank held the proceeds of the sales in trust for the express company by reason of the agency a preference does not arise unless the funds can be followed.
 

 In determining the question it is necessary to recite the facts more fully. Of the $1863.88 received from the sale of cheques August 15, 1931, for which credit was given on the books of the bank, $557.13 was taken in in cash, of which $60.15 represented one cash sale (after deducting commissions) for which a cashier’s check was forwarded but returned unpaid as heretofore stated due to liquidation of the bank. $1206 was received through checks drawn and charged against accounts of the bank and $100.75 was received in checks drawn on other banks which went through clearing house and were paid. From the $1863.88 a commission of $9.25 was deducted leaving a balance of $1854.63. In addition there is the item of $102.50 for travelers cheques delivered in Paris, France, for which a cashier’s check was sent to the express company as stated but was returned unpaid because the bank closed. The drawers at all times had sufficient funds on deposit to cover and pay the checks.
 

 On this date and all times up to and including the time the bank closed its doors, there was cash in bank far in excess of the total amount of the sales.
 

 It is not necessary to be able to identify the partic
 
 *258
 
 ular money deposited nor to show that the amount purported to have been received was converted into specific cash, when such amount is commingled with general funds of’the bank.
 
 Fulton, Supt. of Banks,
 
 v.
 
 Escanaba Paper Co.,
 
 129 Ohio St., 90, 193 N. E., 758. This is the rule prevailing in most jurisdictions. 82 A. L. R., 125, annotation. Such commingling does not of itself, extinguish the right of the owner to follow and reclaim the fund or an equivalent amount. By reason and weight of authority when a trustee or agent commingles trust funds or funds of the
 
 cestui
 
 or principal with his own, the presumption is that when he pays out money from the commingled funds, he pays from his own and not from that which he holds in behalf of the owner in law or equity. Many authorities are collected in 82 A. L. R., 141, annotation.
 

 Applying these principles to the case under discussion there is no difficulty in tracing the fund so far as the concern is with proceeds of cash sales or travelers cheques. Cash proceeds are definitely traced into cash on hand at the time the bank closed.
 

 As to the amount collected from the sales through checks drawn upon the bank itself, a question of greater difficulty is presented. Upon this subject there is a contrariety of opinion. The ‘ ‘ maj ority view ’ ’ is that there is such an augmentation of the assets of the bank that the fund can be followed, and “the minority view,” that there is merely a shifting of credits without augmentation of assets. The authorities on the subject are collected in an exhaustive monograph in 82 A. L. R., 97.
 

 This court adheres to the “majority rule” but is not impelled to that eourse wholly by the weight of precedent. That view seems to be sustained by reason and logic. When the buyer of travelers cheques presents to the bank his own check in payment, the cashier may hand to him currency in the amount of his check and
 
 *259
 
 then receive it back in return for the travelers cheques; or he may take the purchaser’s check and in return therefor deliver the travelers cheques. In either event the purchaser’s check will be charged out of the latter’s account and the proceeds of sale held for the express company. It is no matter which way the transaction is handled; in either event the total amount of the deposits of the bank is decreased by so much cash and the amount held as agent for the express company is increased.
 

 To leave the proceeds of sales commingled with other deposits by accepting the check of purchaser in payment of travelers cheques therefore would seem to have the same effect as for the bank to cash such purchaser’s check and receive the cash back and again commingle it with bank funds. An attempted differentiation would seem to result in a distinction without a difference. At any rate the same end is attained by either process and it is of little moment whether one reaches his destination by going around the road or across lots. The proceeds, representing the purchaser’s check, is in the bank, whichever way the matter is handled. The law looks to the substance of a transaction and not the shadow. The augmentation takes place by the reduction of the amount of the deposits on hand and the increase of the amount the bank holds as agent.
 

 In the case of
 
 Fulton, Supt. of Banks,
 
 v.
 
 Escanaba Paper Co., supra,
 
 there is an excellent and clear- statement of the same theory in a different but effective way. This court is content with the exposition of the doctrine in that case and is measurably committed in the third paragraph of the syllabus.
 

 It is true that in
 
 Fulton, Supt. of Banks,
 
 v.
 
 Gardiner,
 
 127 Ohio St., 77, 186 N. E., 721, some reference is made to the necessity that a trust fund should have a
 
 corpus
 
 or
 
 res
 
 that could be followed but this court in no sense committed itself to the “minority view.” A
 
 *260
 
 careful reading of the
 
 per curiam
 
 opinion discloses that the decision was made on authority of
 
 McDonald, Admr.,
 
 v.
 
 Fulton, Supt. of Banks, supra.
 

 In
 
 Fulton, Supt. of Banks,
 
 v.
 
 B. R. Baker-Toledo Co.,
 
 128 Ohio St., 226, 190 N. E., 459, 93 A. L. R., 933, there is a dictum pointing in the direction of the “minority rule” but the pronouncement in
 
 Escanaba Paper Co. case, supra,
 
 is of later date.
 

 As to proceeds from sale of travelers cheques, which were paid for by checks on other banks, there was an augmentation of assets through satisfaction of the checks by the banks on which they were drawn. How this satisfaction was consummated does not appear from the record.
 

 The conclusion is inevitable that the Ohio bank held all proceeds of collections made on the last day the hank was open as agent for the express company, the owner thereof, and that the trust fund can be followed into the money on hand when it closed, which was ample for that purpose at all times.
 

 There may be other claims entitled to preference on a par with the one involved
 
 here;
 
 if so, the preferred claim in the instant case and all other preferred claims which stand on the same basis must share pro rata, if funds are insufficient to pay all such preferred claims in full. The preferred claims in any event can only be paid to the extent of the minimum amount of cash in bank after the commingling of trust moneys with general funds of the bank.
 

 In allowing preferences no interest will be computed as it has been held that a preferred creditor is not entitled to have interest paid on the principal amount as against general creditors.
 
 Fulton, Supt. of Banks,
 
 v.
 
 B. R. Baker-Toledo Co., supra.
 

 The court finds in the commercial bank case that the preference should be denied as to proceeds of travelers cheques received from August 1 to 13, 1931, inclusive, as a matter of law, but that as to proceeds received
 
 *261
 
 August 14 and 15, 1931, the finding that there was a preference was warranted; and the court finds as to the Ohio bank case preference was properly allowed.
 

 Judgment reversed as to proceeds received August 1 to 13,1931, inclusive, and final judgment for plaintiff in error, otherwise judgment affirmed, in cause No. 25614.
 

 Judgment affirmed in cause No. 25615.
 

 "Weygandt, C. J., Stephenson, Matthias, Day and Zimmerman, JJ., concur.
 

 ■ Jones, J., affirms in both cases.